IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

S3H, INC., a Nevada corporation,

                Plaintiff,                               No. 03:12-cv-01579-HZ

     v.

HOFFMAN CONSTRUCTION                      OPINION & ORDER
COMPANY OF OREGON, an Oregon
limited liability company, and INTEL
CORPORATION, a Delaware
corporation,

                Defendants.

Adam R. Kelly
GARVEY SHUBERT BARER
121 S.W. Morrison Street
Portland, Oregon 97204-3141

/ / /

/ / /

/ / /

1 - OPINION & ORDER

Leon F. Mead
Marek P. Bute
SNELL & WILMER LLP
3883 Howard Hughes Pkwy., #1100
Las Vegas, Nevada 89169

    Attorneys for Plaintiff

Dennis P. Rawlinson
Jeffrey T. Sagalewicz
Cody J. Elliott
MILLER NASH LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204

    Attorneys for Defendants

HERNANDEZ, District Judge:

Plaintiff S3H, Inc. brings this case against defendants Hoffman Construction Company (HCC) and Intel. HCC was the general contractor on a construction project for Intel. Plaintiff was a mechanical subcontractor. Plaintiff's claims arise from a disagreement between plaintiff and HCC regarding the work plaintiff performed and HCC's cancellation of the subcontract.

Defendants move to dismiss the nonforeclosure claims, contending they are subject to a mandatory arbitration provision, and to stay the foreclosure claim pending arbitration. I grant the motion.

BACKGROUND

Plaintiff is a mechanical subcontractor owned by Arlene and Vatche Sarkoyan. Ex. 2 to Sarkoyan Decl. at 5. Plaintiff has been in business since December 2005 and earned revenues of $22,500,000 in 2007, $38,757,000 in 2008, and $70,196,000 in 2009. Id. In September 2010, plaintiff projected its 2010 revenues at $30,000,000, and projected its 2011 revenues at

2 - OPINION & ORDER

$35,000,000. Id.

Plaintiff has performed large projects, including an $18 million heating, ventilation, air conditioning (HVAC) and plumbing project of a Cirque de Soleil Showroom, a $32 million HVAC and plumbing project for the VEER Towers condominiums (two, forty story towers), and a $32 million HVAC and plumbing project for a fourteen acre underground parking garage, plus infrastructure utilities, for a four-tower hotel and condominium complex in Las Vegas. Id. at 8, 16-17.

On September 1, 2010, Vatche Sarkoyan[1] met with Greg Johnston, HCC's Mechanical Vice-President and Dale Trappen, HCC's Purchasing Manager, in Phoenix, Arizona to discuss the possibility of plaintiff bidding for the mechanical work at two projects owned by Intel, one in Arizona and one in Oregon. Johnston told Sarkoyan that plaintiff needed to become "prequalified" in order to bid on projects as an HCC subcontractor. The next day, Trappen sent Sarkoyan the required prequalification form. Ex. 1 to Sarkoyan Decl. Plaintiff completed the forty-eight page packet and returned it with several attachments on September 22, 2010. Ex. 2 to Sarkoyan Decl. In that document, plaintiff represented that it employed "professionals who have tremendous experience in HVAC, plumbing and process piping and systems." Id. at 12. Plaintiff also stated that its "senior management have performed projects with Intel, Genentic, Equinix, MGM Resorts, and with many other highly sophisticated owners and general contractors." Id. at 12.

Discussions between Johnston and Sarkoyan about the "Intel DIX Project" began in early

---

[1] Although Vatche Sarkoyan's wife Arlene is listed as plaintiff's majority owner, because none of the relevant facts involve her, my references to "Sarkoyan" are to Vatche Sarkoyan only.

February 2011.  Exs. 3, 4 to Sarkoyan Decl.; Sarkoyan Decl. at ¶¶ 7, 8.  In response to requests

from Johnston, Sarkoyan began the process of obtaining an Oregon construction contractor's

license and opening offices in Oregon.  Sarkoyan Decl. at ¶ 7.  According to Sarkoyan, Johnston

told him that "time was of the essence" because HCC was working on its potential bidder lists

and Johnston wanted plaintiff to be included on that list.  Id.  Sarkoyan paid $1,000 to enroll in a

safety program required of all contractors bidding for work on Intel construction projects.

Sarkoyan Decl. at ¶ 8.  Plaintiff proceeded to register to be taxed as a business in Oregon, obtain

workers' compensation coverage for Oregon, rent an office, hire employees as staff, and take

other steps to qualify for the Oregon contractor's license.  Id. at ¶ 7.  Sarkoyan explains he would

not have undertaken these steps if they were not required to bid on the Intel project.  Id.

On February 21, 2011, Johnston emailed Sarkoyan to ask how he was "coming on the

Oregon decision to do some work."  Ex. 5 to Sarkoyan Decl.  Johnston told Sarkoyan that

Johnston "really need[ed] another big job player."  Id.  Sarkoyan updated Johnston on his

progress, estimating he would have his contractor's license in one to two months.  Id.  He told

Johnston that "we are very much interested in pursuing Intel work both in Oregon and Arizona.

We will proceed accordingly."  Id.  He expressed interest in coming to Oregon to better his

understanding of the scope of the upcoming projects.  Id.

In early March 2011, Sarkoyan came to Portland and identified, with Johnston, the bid

packages that Johnston wanted plaintiff to bid on.  Sarkoyan Decl. at ¶ 10.  Sarkoyan states that

"[p]rocess waste and plumbing packages" were identified based on what Johnston described as

the "easiest" packages, giving plaintiff, a new contractor on Intel projects a good place to start.

Id.

4 - OPINION & ORDER

Sarkoyan and Johnston continued communicating though the spring of 2011.  Ex. 6 to Sarkoyan Decl.  In mid-April 2011, Sarkoyan emailed Johnston to state that he took and passed the Oregon business law test and that plaintiff had submitted its Oregon contractor's license application.  Ex. 7 to Sarkoyan Decl.  Johnston responded about his desire to "talk some strategies ,, confidential," and reiterated to Sarkoyan that plaintiff should bid on the "process waste and plumbing packages."  Id.; Sarkoyan Decl. at ¶ 11.  Johnston offered to help in any way he could.  Sarkoyan Decl. at ¶ 11.

By mid-May 2011, plaintiff had met the requirements for bidding on an Oregon Intel project as an HCC subcontractor.  Sarkoyan Decl. at ¶ 13.  The bid package was released on May 25, 2011 and contained two DVDs totaling approximately 927 megabytes of data, representing 7,640 pages of documents.  Sarkoyan Decl. at ¶ 14.  Plaintiff submits as an exhibit the fifty-page Invitation to Bid and Instructions to Bidders.  Id. at ¶ 15; Ex. 10 to Sarkoyan Decl.  The Instructions to Bidders begins with a notice, in bold, informing the bidder that it is responsible for completely reading the terms of the Request for Proposal and all the information contained "whether of a technical or commercial nature."  Ex. 10 to Sarkoyan Decl. at 2.  The bidder was instructed that failure to understand the information, or to seek clarification of the information, would not excuse the bidder "from prosecution of the Work according to the terms and conditions set forth in these documents, or as modified by any addenda, bid clarifications, or post award Modifications to any resultant Subcontract, Purchase Agreement or Purchase Order."  Id. The Invitation to Bid and Instructions to Bidders also notified the bidder that the "Bidder awarded the Work shall be required to execute a Subcontract on Contractor's standard forms." Id. at 10.

5 - OPINION & ORDER

HCC's standard subcontract was one of the documents on the DVD which contained approximately 6,800 pages of material. Sarkoyan Decl. at ¶ 17. It was located in a folder labeled "Procurement" which was in the "Misc Docs" folder on the DVD. Id. It was named "DIX-Subcontract Template." Id. The "Bid Package - List of Inclusions" which is akin to a table of contents, separately identified the subcontract as one of six principal documents in the bid package. Ex. 10 to Sarkoyan Decl. at 2. The subcontract is twenty-two pages. Ex. 11 to Sarkoyan Decl.

A representative of plaintiff's attended a "pre-bid" meeting with bidders in Portland on May 31, 2011. Sarkoyan Decl. at ¶ 10. Plaintiff alleges that as a result of design deficiencies which could not be resolved at the pre-bid conference, HCC extended the bid deadline from June 9, 2011 to June 14, 2011, and then extended it again to June 21, 2011. Sarkoyan Decl. at ¶ 22. Plaintiff submitted its bid proposal on June 21, 2011. Id. at ¶ 23; Ex. 13 to Sarkoyan Decl. In its proposal, plaintiff stated that it was "pleased to submit the following pricing for the above-mentioned process waste systems" and that "S3H is excited for the opportunity to be working with your team on this project." Ex. 13 to Sarkoyan Decl. at 2, 5.

In its proposal, plaintiff represented that it had "carefully read and examined the Technical Specifications, all Drawings, Instructions to Bidders, Special Conditions, Subcontract and/or Purchase Agreement Terms and Conditions and all addenda thereto." Id. at 6. Plaintiff further represented that it had "bid the Work complete" in accordance with all of the "aforementioned items," meaning the specifications, drawings, etc., including the subcontract, and that it agreed "[t]o enter into and execute a **HOFFMAN CONSTRUCTION COMPANY OF OREGON**, Standard Subcontract, if awarded on the basis of this Proposal, within five (5)

6 - OPINION & ORDER

working days of receipt thereof[.]" Id.

In the cover letter accompanying the bid, under a section marked "PRICING," plaintiff "reserve[d] the right to review the provisions of the prime contract." Ex. 13 to Sarkoyan Decl. at 4. The parties offer differing interpretations of the meaning of plaintiff's reference to "prime contract." Plaintiff argues that it was referring to the subcontract between plaintiff and HCC if plaintiff were awarded the bid. Sarkoyan Decl. at ¶ 23. Defendants state that "prime contract" refers to the contract between Intel as the owner and HCC as the prime contractor and does not refer to the subcontract. Defendants offer the more reasonable interpretation given that the subcontract had been in plaintiff's possession since late May 2011, casting doubt on plaintiff's need to review its provisions.

Johnston and Sarkoyan continued to exchange emails regarding a meeting for the "complete page turn to v[e]rify scope." Ex. 14 to Sarkoyan Decl. Sarkoyan traveled to Portland for the meeting which occurred on July 5, 2011. Sarkoyan Decl. at ¶ 26. In written notes, HCC addressed plaintiff's questions and concerns both before and after the meeting. Sarkoyan Decl. at ¶¶ 25-27; Exs. 15, 16 to Sarkoyan Decl. Plaintiff modified its bid and resubmitted it on July 12, 2011. Id. at ¶ 28; Ex. 1 to Elliot Reply Decl. The modified bid no longer reserved the right to review the "prime contract" or any contract. Ex. 1 to Elliot Reply Decl.

On August 5, 2011, Sarkoyan received a call that plaintiff's bid was accepted. Sarkoyan Decl. at ¶ 29. On August 8, 2011, plaintiff received a copy of HCC's Notification of Intent to Award and Notice to Proceed, dated August 6, 2011. Id. at ¶ 30; Ex. 17 to Sarkoyan Decl. This notice stated that "final negotiations and agreement upon all associated terms and conditions" were not yet complete, but that the parties desired to enter into an "interim relationship setting

7 - OPINION & ORDER

forth contractual rights and obligations of each party pending issuance of formal agreement documents." Ex. 17 to Sarkoyan Decl. at 1.  The Notification of Intent to Award was "issued to set forth that interim relationship."  Id.  It further stated that "[u]pon completion of negotiations and achieving mutual agreement to all terms and conditions relating to the Work," formal agreement documents would be issued, superseding the Notice of Intent to Award.  Id.  Plaintiff accepted and signed the Notice of Intent to Award on August 10, 2011.  Id. at 3.

It was only at this point that plaintiff first forwarded the standard subcontract template to its counsel for evaluation.  Sarkoyan Decl. at ¶ 30.  On August 12, 2011, plaintiff's Chief Financial Officer John Miramontes emailed Symington with comments and questions following plaintiff's "initial review of the contract provided to us dated August 8, 2011[.]"  Ex. 19 to Sarkoyan Decl.  None of the comments and questions directly concerned the dispute resolution section of the subcontract.[2]

That same day, Symington responded, clarifying certain items and agreeing to a change requested by plaintiff.  Ex. 19 to Sarkoyan Decl.  In response to a couple of plaintiff's inquiries, Symington explained that

> [o]ur subcontract template documents are included with the bidding documents for all bid packages.  The purpose of this is to allow all bidders the opportunity to review the subcontract prior to submitting a bid for the work.  The time for contract negotiation is prior to award, not after the fact.

---

[2]  However, plaintiff did request a change to a different section concerning hindrance or delay claims.  Ex. 18 to Sarkoyan Decl. at 20.  Although the hindrance or delay provision plaintiff referred to is not part of the dispute resolution provisions in Section XVII, it provides that claims for hindrance or delay may entitle the subcontractor to a claim which may be "controlled and disposed of as set forth in Section XVII[.]"  Id.  Thus, at least one of plaintiff's comments could be viewed as indirectly raising an issue as to the dispute resolution section in Section XVII.

8 - OPINION & ORDER

Id. at 1.

The subcontract, in the amount of $21,946,509.82, was executed on August 12, 2011. Ex. 18 to Sarkoyan Decl. at 1, 12.

The parties present competing interpretations of plaintiff's performance of the Work[3], with plaintiff attributing problems to HCC's design deficiencies and incomplete plans, necessitating hundreds of change orders, and HCC blaming plaintiff's inability to timely perform its work, necessitating daily "project alignment" meetings between HCC and plaintiff. Ultimately, the relationship between plaintiff and HCC broke down, with HCC declaring plaintiff in default on August 9, 2012, and demanding that plaintiff cure its performance by August 15, 2012. Before August 15, 2012, however, plaintiff submitted an "Omnibus Request for Equitable Adjustment (Cumulative Impacts to S3H)," dated August 13, 2012, to HCC, then supplemented that request with an August 21, 2012 "Supplemental to Omnibus for Equitable Adjustment (Cumulative Impacts to S3H). First Am. Compl. at ¶ 16; Ex. 6 to First Am. Compl. On August 24, 2012, HCC terminated plaintiff from the project because of its failure to cure the defaults. In response, plaintiff filed this action.

In the First Amended Complaint, plaintiff brings a claim for declaratory relief in which plaintiff seeks a declaration that the subject disputes are not covered by the dispute resolution provision of the subcontract, that certain discrete provisions of the subcontract are procedurally and substantively unconscionable, and that because these provisions permeate the subcontract,

---

[3] HCC and plaintiff later entered into a second subcontract dated February 1, 2012. First Am. Compl. at ¶ 11. The parties refer to both agreements together as either "the Work," or "the subcontract." Plaintiff alleges the new subcontract should have been a change order to the original August 12, 2011 contract, but, in the end, it was a new contract. Id. The arbitration provision in the February 1, 2012 subcontract was identical to the one in the original subcontract.

the entire subcontract is unenforceable against plaintiff.  Plaintiff also brings the following

claims:  breach of contract against HCC; foreclosure of construction lien against Intel; breach of

the implied covenant of good faith and fair dealing against HCC; abandonment of contract

against HCC; unjust enrichment against HCC and Intel; and intentional interference with

business relations against HCC.

STANDARDS

Defendants move to dismiss based on the Federal Arbitration Act, 9 U.S.C. §§ 1-16

(FAA), which removes the court's subject matter jurisdiction to hear the claim when there is a

valid, enforceable arbitration clause. Therefore, defendants' motion to dismiss is "one means to

raise its arbitration defense.  In effect, [defendant's] motion is a petition to this court within the

meaning of § 4 of the FAA."  Rogue v. Applied Materials, Inc., No. 03:03-cv-1564-ST, 2004 WL

1212110, at *4 (D. Or. Feb. 20, 2004) (adopted by J. Brown, June 1, 2004)

The FAA states that written agreements to arbitrate arising out of transactions involving

interstate commerce "shall be valid, binding, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 U .S.C. § 2.  If the issue

is referable to arbitration under the agreement, then the court must direct the issue to arbitration

and stay the trial.  9 U.S.C. § 3.  An agreement to arbitrate is to be "rigorously enforce[d.]"  Dean

Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985).

Courts strongly favor arbitration and broadly construe arbitration clauses.  E.g.,

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) ("any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration")

(internal quotation marks omitted); Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir.

1999) ("The standard for demonstrating arbitrability is not high").

As Judge Stewart explained in a 2010 opinion:

> The court's role under the FAA is limited to determining (1) whether a valid agreement to arbitrate exists and if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms.

Morrow Equip. Co., v. Baker Concrete Constr., Inc., No. 03:09-cv-1335-ST, 2010 WL 4483914, at *4 (D. Or. June 8, 2010) (internal quotation marks omitted) (adopted by J. Haggerty, Nov. 1, 2010).

## DISCUSSION

Plaintiff argues that the dispute resolution provision is unenforceable because it is procedurally and substantively unconscionable. Plaintiff also argues that the provision is void as against public policy.

Courts decide as a matter of law whether an arbitration clause is unconscionable based on the "facts in existence at the time the contract was made." Vasquez-Lopez v. Beneficial Or., Inc., 210 Or. App. 553, 566, 152 P.3d 940, 948 (2007). "Procedural unconscionability" "refers to the conditions of contract formation and focuses on two factors: oppression and surprise." Id. at 566, 152 P.3d at 948 (internal quotation marks omitted). "Substantive unconscionability" "refers to the terms of the contract as opposed to the circumstances of formation, and focuses on the one-sided nature of the substantive terms." Id. at 567, 152 P.3d at 948 (internal quotation marks omitted).

The party asserting unconscionability has the burden of demonstrating that the arbitration provision is unconscionable. Hatkoff v. Portland Adventist Med. Ctr., 252 Or. App. 210, 216,

287 P.3d 1113, 1118 (2012).

I.  Procedural Unconscionability - Oppression & Surprise

    A.  Oppression

Oppression in contract formation exists when there is inequality in bargaining power between the parties, resulting in no real opportunity to negotiate the terms of the contract and the absence of meaningful choice.  <u>Vasquez-Lopez</u>, 210 Or. App. at 566, 152 P.3d at 948.  Surprise involves asking whether the allegedly unconscionable terms were hidden from the party seeking to avoid them.  <u>Id.</u>

Plaintiff argues that the dispute resolution provision is procedurally unconscionable because of plaintiff's unequal bargaining power combined with evidence of HCC's "use of compulsion, deception, and high pressure tactics in formation of the contract."  Pl.'s Resp. Mem. at 16.  I disagree.

As to unequal bargaining power, plaintiff portrays itself as a small, unsophisticated company which was lured under false pretenses, and at great cost, to do business in Oregon. Plaintiff further argues that it was misled into believing that contract terms could be negotiated post-bid or post-award.  The facts do not bear this out.

First, plaintiff had previously performed several multi-million dollar construction projects before engaging in the bid process on this project, and had multi-million dollar earnings in the several years before bidding on this project.  It is not a small, unsophisticated business. Moreover, there is no evidence in the record regarding the size or sophistication of HCC.  Even if I assume that it is a large, sophisticated company, plaintiff fails to establish there was unequal bargaining power between itself and HCC.

Second, the record does not support plaintiff's suggestion that HCC unreasonably pressured plaintiff to do business in Oregon and bid on this project. Nothing in the record indicates that Sarkoyan met with HCC representatives in Phoenix in September 2010 against his will. Nothing in the record indicates that plaintiff was obligated to continue a relationship with HCC after meeting the HCC representatives. The only evidence of any pressure by HCC is one February 2011 statement from Johnston telling plaintiff that he "really need[ed] another big job player" in an email asking plaintiff how it was "coming on the Oregon decision to do some work." Ex. 5 to Sarkoyan Decl. The fact that plaintiff may have been experiencing the negative effects of a downward economy has nothing to do with HCC. That HCC invited and encouraged plaintiff, and actively supported plaintiff's bid, is not unreasonable pressure, coercion, or deception.

Third, plaintiff's interpretation of the facts regarding an ability to negotiate the subcontract, post-bid acceptance, is not supported by the evidence. The "Notice" in the Invitation to Bid and Instructions to Bidders that plaintiff relies on does not <u>expressly</u> state that there <u>will</u> be post-bid modifications to the subcontract. Rather, in one paragraph it provides (1) that the bidder is responsible for completely reading the terms and conditions whether of a technical or commercial nature; and (2) that the bidder's failure to understand the information or to seek clarification will not excuse the bidder from prosecution of the Work according to the terms and conditions set forth in the documents or "as modified by . . . post award Modifications to any resultant Subcontract . . ." Ex. 10 to Sarkoyan Decl. at 2. The paragraph suggests that the bidder will be expected to conform to the terms of the documents, whether as originally provided or modified later, but it does not expressly create the opportunity for post-bid modifications. I agree

with defendants that when the entire paragraph is read, it conveys that the bidder cannot raise as a

defense its own failure to read and understand the materials and it is not instructive as to whether

the bidder may initiate post-bid or post-award negotiations regarding the terms and conditions of

the template subcontract.

    Moreover, any ambiguity was clarified by another statement in the Invitation to Bid and

Instructions to Bidders which did expressly provide that the "Bidder awarded the Work shall be

required to execute a Subcontract on Contractor's standard forms." Id. at 10. This made clear

that the template subcontract would control.

    If plaintiff was still under the impression that it would have the opportunity to modify the

subcontract post-bid or post-award, it should not have stated in its June 21, 2011 bid that it

agreed to enter into HCC's standard subcontract if awarded the bid. Ex. 13 to Sarkoyan Decl. at

6. Plaintiff's reserving a right to review the provisions of the "prime contract" is not evidence of

a misrepresentation by HCC about post-bid or post-award contract modification for several

reasons: it was not a statement made by HCC, it referred to the "prime contract" not the

subcontract, and the reservation was omitted from plaintiff's modified bid submitted the next

month.

    Finally, in the Notice of Intent to Award, HCC told plaintiff that although "final

negotiations and agreement upon all associated terms and conditions has not been completed," an

interim relationship would exist "pending issuance of formal agreement documents." Ex. 17 to

Sarkoyan Decl. at 1. HCC then stated that upon "completion of negotiations and achieving

mutual agreement to all terms and conditions relating to the Work," the formal documents would

be issued. Id. The next paragraph indicated that upon final negotiation of the terms of the

agreement, the documents would be sent to plaintiff for execution.  Id.

Plaintiff argues that this language is yet another misrepresentation by HCC that the subcontract would be subject to post-award modification.  But, while the paragraph generally suggests that post-award negotiations are contemplated, it also suggests that such negotiations are related to the "terms and conditions relating to the Work," not to the template subcontract form.

Plaintiff and HCC did not have a great disparity in bargaining power.  The evidence does not support coercion or oppression of plaintiff by HCC, nor that HCC misrepresented the ability to negotiate terms of the template subcontract post-award.

B.  Surprise

"Surprise involves the extent to which the supposedly agreed terms were hidden from the party seeking to avoid enforcement of the agreement."  Motsinger v. Lithia Rose-FT, Inc., 211 Or. App. 610, 614, 156 P.3d 156, 160 (2007).  Although there is no dispute that the template subcontract was one of many thousands of pages of documents contained in the bid package, plaintiff never states that it was unaware of its presence in the bid package.  Rather, because plaintiff was overwhelmed by the volume of material and because of the relatively short time it had to prepare the bid, it chose to focus on the technical aspects of the bid rather than the form subcontract.  But, that was a decision made entirely by plaintiff.

HCC called attention to the presence of the subcontract in the "Table of Contents" of the Invitation to Bid and Instructions to Bidders.  HCC called attention to the importance of the subcontract when it is expressly stated in the eight-page bidding instructions, in a separately numbered paragraph, that the bidder who was awarded the work would be required to execute a subcontract on the contractor's standard form.  Thus, while the template subcontract was buried

in the midst of thousands of pages of documents (many of which were technical drawings and easily differentiated from boilerplate contract language), plaintiff has no basis to argue that it was "surprised" by the presence of a template subcontract or the contents of that subcontract.

In regard to the time for preparation of the bid, plaintiff had from May 26, 2011 to June 21, 2011 to submit its initial bid, after HCC extended the original bid deadline from June 9, 2011. Then plaintiff had another three weeks in which to submit its revised bid proposal on July 12, 2011. And, it had more than three weeks from the revised bid proposal on July 12, 2011 to when it received the award of the bid on August 5, 2011. Thus, plaintiff had approximately six weeks between the time it received the Invitation to Bid on May 26, 2011 and when it submitted its revised bid proposal on July 12, 2011 to seek clarification of any issues regarding the template subcontract. It had more than two months between the time it received the Invitation to Bid and when it received the award. Under these circumstances there is no surprise.

Plaintiff fails to establish that the formation of the contract was procedurally unconscionable.

## II. Substantive Unconscionability

Plaintiff argues that the Section XVII of the subcontract which contains the dispute resolution provisions, is substantively unconscionable because it is so one-sided that it deprives plaintiff of its legitimate opportunity to have its disputes resolved fairly. Plaintiff specifically points to limits on the time for filing claims, the lack of mutuality, and the lack of a fee-shifting provision. Plaintiff also complains that the dispute resolution provisions require plaintiff to file a separate claim for every change order dispute, resulting in onerous arbitration filing fees. As a result, plaintiff argues that when the dispute resolution provisions are considered as a whole, they

effectively strip plaintiff of any meaningful opportunity to have disputes resolved in an impartial forum.

A.  Section XVII - the Dispute Resolution Provisions

The entire dispute resolution section of the template subcontract is as follows:

XVII.  (a)    Should Owner file a claim, counterclaim, or cross claim against Contractor relating to, or arising out of, in whole or part, performance of Subcontractor's Work, Subcontractor and its surety agree to be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the Contract and shall likewise be bound by all rulings, decisions or determinations made pursuant to the Contract, including but not limited to the final decision of an appeal board, arbitration or court of competent jurisdiction whether or not Subcontractor or its surety is a party to such proceeding.  If called for by Contractor, Subcontractor shall defend at no cost to Contractor all claims, or that portion thereof, relating to or arising out of the performance of Subcontractor's Work, and shall become a party to such proceeding or determination.

(b)    As to any claim by Subcontractor on account of acts or omissions of Owner, or its representatives, Contractor agrees to present to Owner, in Contractor's name, all of Subcontractor's claims for extras and equitable adjustments and to further invoke on behalf of Subcontractor those provisions of the Contract for determining dispute.  Subcontractor shall have full responsibility for preparation and presentation of such claims and shall bear all expenses thereof, including attorney's fees.  Contractor may inspect, review and audit all Subcontractor's documentation relevant to all such claims promptly upon Contractor's request. Subcontractor agrees to be bound by the procedure and final determinations as specified in the Contract and agrees that it will not take any other action with respect to any such claims and will pursue no independent litigation with respect thereto or any dispute resolution procedures.  Subcontractor shall not be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from Owner on account of Subcontractor's claims less any markups entitled to or costs incurred by Contractor.  Subcontractor shall accept such amount, if any as full discharge of all such claims. With respect to such claims, Subcontractor shall give written notice to Contractor within

sufficient time to permit Contractor to give notice to Owner within the time allowed by the Contract.  Failure to give such notice shall constitute a waiver of such claim.

(c)     Notwithstanding paragraph (b) of this Section, Contractor shall have the right, at any time, to settle or otherwise dispose of any claim by Subcontractor on account of acts or omissions of Owner or its representatives.  Should Contractor exercise this right, Contractor shall determine the amount, if any to be paid to Subcontractor on account of such claim.  Such decision shall be final and binding unless Contractor's decision is submitted to arbitration in accordance with paragraph (d) of this Section.

(d)     Should a dispute arise which is not controlled or determined by the above paragraphs of this Section or other provisions of this Subcontract, then said dispute shall be settled by Contractor's written decision with respect to such dispute.  Contractor may inspect, review and audit all Subcontractor's documentation relevant to all such dispute promptly upon Contractor's request. Such written decision shall be conclusive and shall be final and binding on Subcontractor and its surety unless Subcontractor, within thirty (30) days following the receipt of such written decision, shall file a demand for arbitration in accordance with the then current rules of the Construction Industry Arbitration Rules of the American Arbitration Association, unless the parties mutually agree otherwise.  If such demand is filed, then the dispute shall be decided by arbitration in accordance with such Rules, before three (3) neutral arbitrators. Each Party shall be responsible for and bear the cost of its own Attorney's fees and expenses and an equal portion of the Arbitrator's costs and expenses shall apply regardless of any other legal action related to the matter being arbitrated.  This agreement to arbitrate shall be specifically enforceable and the arbitration decision shall be final and binding as between Contractor and Subcontractor and its surety.  If arbitration is conducted involving Owner, Contractor or any other party concerning or in any way relating to responsibility under this Subcontract, any dispute relating to the Work required or alleged to be required herein this Subcontract, or Subcontractor, then Subcontractor expressly agrees to a consolidated or joint arbitration, if and as called for by Contractor.  Unless Contractor calls for such consolidation or joinder, or otherwise agrees in writing to joinder or consolidation, no request for joinder or consolidation shall be determined except by a court of competent

jurisdiction; and no arbitral body, including within limitation, the American Arbitration Association, shall have jurisdiction for any such determination.

(e)      Subcontractor shall proceed diligently with the Work pending final determination of any dispute or claim.

(f)      The provisions of this Section shall survive the completion or termination of this Subcontract.

(g)      Subcontractor covenants and expressly agrees that if for any reason the Subcontract is not completed as contemplated herein or if any dispute shall arise over the entitlement of the rights of Subcontractor, the Subcontractor's sole recourse shall be an action as provided herein to enforce the several terms and provisions of this Subcontract; and no action shall lie in favor of Subcontractor in the nature of quantum meruit, quantum velebant, quasi-contract, or any other theory of law or equity.

Ex. 18 to Sarkoyan Decl. at 22-23.

B.  Analysis Under Oregon Law

In analyzing substantive unconscionability, the court looks not at the one-sided application of a provision but rather to the one-sided effect.  Motsinger, 211 Or. App. at 623, 156 P.3d at 164.  In Motsinger, the plaintiff argued that a unilateral arbitration clause requiring arbitration of employment-related claims by the employee, but not by the employer, was unconscionable because it lacked mutuality.  After examining cases from Oregon and other jurisdictions, the court noted a line of cases which had examined the effect of the lack of mutuality on the rights of the employee.  Id. at 622, 156 P.3d at 621.  Instead of focusing simply on the presence of a unilateral arbitration requirement, these courts examined the effect of that clause and whether under the clause, the employee was left without significant legal resources when compared to the recourse of the employer.  Id. (citing cases).

19 - OPINION & ORDER

The <u>Motsinger</u> court then concluded that "an approach that focuses on the one-sided <u>effect</u> of an arbitration clause - rather than on its one-sided <u>application</u> - to evaluate substantive unconscionability is most consistent with the common law in Oregon regarding unconscionability of other kinds of contractual provisions and with state and federal policies regarding arbitration." <u>Id.</u> at 623, 156 P.3d at 164. The court explained that it "must determine on a case-by-case basis whether, given the unequal bargaining power, the effect of the arbitration clause makes the parties' respective obligations so unbalanced as to be unconscionable." <u>Id.</u> at 625, 156 P.3d at 165. The court suggested that while answering that question, it must be mindful that "the doctrine of unconscionability does not relieve parties from all unfavorable terms that result from the parties' respective bargaining positions; it relieves them from terms that are <u>unreasonably</u> favorable to the party with greater bargaining power." <u>Id.</u> at 626-27, 156 P.3d at 166, 167 (further noting that "Oregon courts have been reluctant to disturb agreements between parties on the basis of unconscionability, even when those parties do not come to the bargaining table with equal power.").

Defendants argue that I am limited to considering only the actual arbitration paragraph in subsection (d) and am prohibited from reviewing other portions of the dispute resolution section of the subcontract. I reject this argument. The cases defendants rely on state that in analyzing a challenge to unconscionability of a contract with an arbitration provision, the court is limited to analyzing the arbitration provision and any argument about the unconscionability of the contract as a whole is reserved to the arbitrator (should the arbitration provision be enforceable). <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 445-46 (2006); <u>Rogue</u>, 2004 WL 1212110, at *5 (D. Or. Feb. 20, 2004). But, those cases were distinguishing between the arbitration provision

and other unrelated sections of the contract.  They did <u>not</u> make a distinction between an

arbitration provision and the surrounding dispute resolution provision in which the arbitration is

embedded.  Because the arbitration provision is part of the dispute resolution section, and in fact

is the culmination of the process outlined in the dispute resolution section, I have jurisdiction to

consider the entire section in analyzing plaintiff's substantive unconscionability argument.

C.  Discussion of Specific Provisions

1.  Pass-Through Provisions:  Subsections (b) and (c)

Subsections (b) and (c) of Section XVII of the subcontract address claims by the

subcontractor on account of acts or omissions of the owner.  Because these claims "pass through"

the general contractor, defendants refer to these as "pass through" claims.  Plaintiff makes several

arguments in support of its position that the provisions deprive it of the opportunity to present its

claims.

Plaintiff first argues that these subsections deny plaintiff the independent right to pursue

its own claims and force plaintiff to stand by and "do nothing."  Yet, plaintiff complains, these

sections require plaintiff to be bound by the "final determination" and to pay for its own

expenses, including attorney's fees.

Although subsection (b) states that the contractor will present the subcontractor's claims

for extras and equitable adjustments to the owner in the contractor's name, it also states that the

subcontractor has full responsibility for preparing and presenting the claims.  As a result, the

subsection does not strip the subcontractor of participating in the presentation of the claim to the

owner.  And, while subsection (c) states that notwithstanding subsection (b), the contractor has

the right to settle claims by the subcontractor against the owner, the subcontractor is still free to

take an unfavorable decision to arbitration.  Accordingly, plaintiff is not deprived of an impartial decisionmaker.

Under subsection (b), the subcontractor is bound to the "procedure and final determinations as specified in the Contract" and agrees not take "any other action" or to "pursue" any "independent litigation" with respect to the claims.  "Contract" is defined in the subcontract as the prime contract between HCC and Intel and thus, does <u>not</u> refer to the "procedure and final determinations" in the subcontract.  Ex. 18 to Sarkoyan Decl. at 19.  The "procedure and final determinations" in the contract between HCC and Intel is a dispute resolution procedure which culminates in binding arbitration.  Ex. 2 to Elliot Decl.  Requiring plaintiff to submit its claims against Intel to arbitration is not an onerous one-sided provision.[4]

Plaintiff attacks what it considers to be an overly restrictive time limit in which to present its pass-through claims.  Subsection (b) provides that with respect to claims for extras and equitable adjustments that the subcontractor has against the owner, the subcontractor is to give written notice to the contractor "within sufficient time to permit Contractor to give notice to Owner within the time allowed by the Contract.  Failure to give such notice shall constitute a waiver of such claim."  Ex. 18 to Sarkoyan Decl. at 22.

Plaintiff contends that the "time allowed by the Contract" is the five days provided in

---

[4]  Section XVII is somewhat unclear in regard to the process by which the pass-through claims get resolved.  In subsection (b), the requirement that the subcontractor be bound by the "procedure and final determinations as specified in the Contract" indicates, as noted above, that the dispute resolution provision in the prime contract controls.  But, subsection (d) of Section XVII, when read together with subsection (c), indicates that if the dispute is not resolved to the subcontractor's satisfaction, arbitration under subsection (d) is allowed.  Because, either way, the dispute resolution process culminates in arbitration, I do not attempt to offer a conclusive interpretation of these provisions.

Section VI of the subcontract for hindrance or delay claims.  Pl.'s Resp. Mem. at 26; Ex. 18 to

Sarkoyan Decl. at 20.  But, Section VI is part of the <u>subcontract</u> and the word "Contract" in the

phrase "time allowed by the Contract" refers to the prime contract.  Furthermore, Section VI of

the subcontract addresses claims the subcontractor has for hindrance or delay while subsection

(b) of Section XVII concerns the claims the subcontractor has against the owner for "extras and

equitable adjustments."  I do not read subsection (b) in Section XVII to require the subcontractor

to give the contractor five days notice for claims for extras and equitable adjustments.  I am

unaware that the "time allowed by the Contract" has been made part of the record.  As such,

plaintiff, who bears the burden of establishing unconscionability, fails to demonstrate that

subsection (b) contains an onerous one-sided time limit.  The provision does not effectively

deprive the subcontractor of the opportunity to bring a claim against the owner.

Furthermore, a five-day limit for making hindrance or delay claims is not onerous.  The

subcontractor knows, upon the occurrence of the hindrance or delay, that it has been hindered or

delayed.  It may not know the cause, but it possesses knowledge about a hindrance or delay as

soon as it has been hindered or delayed.

Next, plaintiff is under the impression that subsection (b) requires it to file a separate

claim for each change order.  The source of plaintiff's position is unclear.  The language states

that the contractor "agrees to present to Owner . . . <u>all</u> of Subcontractor's claims for extras and

equitable adjustments . . . ."  Ex. 18 to Sarkoyan Decl. at 22 (emphasis added).  While this

addresses the presentation of claims to the owner rather than the notice of a claim by the

subcontractor to the contractor, the fact that the subsection uses "all" instead of "each" gives

some indication that claims for extras and equitable adjustment are treated collectively.

To the extent plaintiff relies on the five-day provision in Section VI to argue that a separate claim is required for each change order, I have already indicated that the five-day limit in Section VI pertains to hindrance or delay claims and not to claims for extras and equitable adjustments. Even if I consider plaintiff's argument to be that each "change order" is a separate claim for hindrance or delay, this is not onerous given, as I explained above, that plaintiff is on notice of such a claim as of the time of the hindrance or delay. Moreover, plaintiff offers no authority to support its position that a dispute resolution procedure requiring the filing of multiple claims is so one-sided as to deprive a party of the meaningful opportunity of impartial review.

Subsection (b) further requires the subcontractor to pay its own costs and attorney's fees in presenting its claims against the owner via the contractor. In a 2010 case, Judge Acosta indicated that the fact that an arbitration provision requires each party to bear its own costs and fees of arbitration does not, by itself, render the provision substantively unconscionable. Le v. Gentle Dental of Or., No. 03:09-cv-01352-AC, 2010 WL 3394542, at *7-8 (D. Or. July 29, 2010) (adopted by J. Brown, Aug. 25, 1010). Instead, "Oregon courts act as gatekeepers to determine whether, in any particular case, those costs do not convert the agreement to one that is unconscionable." Id. at *7. Citing Motsinger, Judge Acosta looked at the following factors to determine if the cost provision denied the plaintiff the ability to vindicate her rights: "'(1) whether plaintiff will bear any costs at all in arbitration, (2) if so, what those costs would be, and (3) what deterrent effect, if any, those potential costs would have on plaintiff's ability to bring an action to vindicate her rights.'" Id. at *5 (quoting Motsinger, 211 Or. App. at 618, 156 P.3d at 162).

24 - OPINION & ORDER

The party who asserts that an arbitration provision is invalid on the basis of costs and fees, "must offer evidence of the 'likely costs of arbitration or the potential impact of those costs on her' so that the court may determine the 'deterrent effect, if any, those costs would have on a plaintiff's ability to bring an action to vindicate her rights.'" Id. (quoting Motsinger, 211 Or. App. at 618, 156 P.3d at 162).

Plaintiff offers no evidence of the fees and costs it would incur to initially prepare and present its claims against the owner. Thus, its argument regarding any onerous effect of the attorney fee provision in subsection (b) is without merit.

If the claims culminate in arbitration, plaintiff contends the arbitration costs are so onerous that they effectively deprive plaintiff of its right to arbitrate its claims. Consistent with its theory that it has to file a separate claim for each change order, requiring eighty separate arbitrations to resolve the disputes at issue in this litigation, plaintiff contends it will face approximately $78,000 in arbitration filing fees alone, before other costs such as its share of the payment for three arbitrators as required by subsection (d) of Section XVII and its own attorney's fees. Bute Decl. at ¶ 3; Pl.'s Ex. 24 (showing American Arbitration Association (AAA) Standard Fee Schedule of $775 for an initial filing fee for claims under $10,000, plus another $200 per dispute after the first hearing); see also Pl.'s Ex. 24 (showing AAA Flexible Fee Schedule of $400 for an initial filing fee for claims under $10,000, but with an additional $475 "proceed fee" as well as a $200 final fee for each claim).

Alternatively, if the disputes at issue in this litigation proceeded to arbitration in one claim, the initial filing fee would be $15,126.51 or $17,126.51 depending on whether one filed under the Standard Fee Schedule or the Flexible Fee Schedule. Bute Decl. at ¶¶ 4-7 (as corrected

by Notice of Errata) (explaining that plaintiff's claim amounts to $33,265.140.96, and because it

exceeds $10 million, the filing fee is based on the value of the claim); Pl.'s Ex. 24 (AAA Fee

Schedule for both Standard and Flexible Fee Schedules).

As plaintiff acknowledges, its claims are valued at over $33 million. Even if I accept

plaintiff's interpretation of the subcontract and calculate arbitration filing fees based on eighty

separate claims, the filing fees are $78,000 or $86,000 depending on whether the Standard or

Flexible Fee Schedule is used, meaning the filing fees are somewhere between two tenths of one-

percent and three tenths of one percent of its claims. More importantly, while plaintiff argues

that these fees are so onerous as to effectively deprive it of its right to arbitrate, plaintiff offers no

evidence of this proposition in the form of financial information and statements from its owners

or managers.

In Le, the plaintiff submitted a declaration in which she stated that the $6,000 cost to

initiate arbitration would have been an "extreme burden" or not feasible for her. Le, 2010 WL

3394542, at *6. Judge Acosta rejected this as sufficient evidence of unconscionability because it

did "not establish the potential impact on her and, as importantly, whether that impact would

deter her from pursuing her discrimination claims." Id. Similarly here, the issue is whether the

arbitration fees would actually prevent plaintiff from pursuing its claims. Even assuming the

higher range of fees calculated on eighty separate claims, plaintiff fails to establish that those fees

would in fact deter plaintiff from pursuing its claims.

Finally, at oral argument, plaintiff raised the argument that the language in subsection (c)

allows it to arbitrate only the contractor's decision and not the underlying merits of plaintiff's

claim. I reject that interpretation as an overly restrictive reading of the language.

26 - OPINION & ORDER

2.   Arbitration Clause - Subsection (d)

Plaintiff raises several arguments regarding subsection (d) which spells out the right to arbitration.  That paragraph first provides that the contractor is to settle any dispute not controlled or determined by the preceding paragraphs.  The contractor is to provide a written decision regarding the dispute and that decision is conclusive and "final and binding" on the subcontractor unless the subcontractor files a demand for arbitration within thirty days of receiving the written decision.  The fact that the contractor renders a decision on the dispute in the first instance is not so one-sided as to deny plaintiff an impartial forum for resolution of its claims because plaintiff retains the right to arbitrate the dispute should plaintiff disagree with the contractor's decision.

Plaintiff takes issue with the fact that there is no timeframe in which the contractor must issue its written decision.  Defendants do not respond to this argument.  While I agree with plaintiff that the failure of the contractor to ever issue a written decision could render plaintiff's right to arbitrate meaningless, the law implies a reasonableness provision, meaning that the contractor has a reasonable time in which to issue a written decision on the dispute after inspecting, reviewing, and auditing the subcontractor's documentation relevant to the dispute.

Under Oregon law, contracts include an implied obligation of good faith and fair dealing "to facilitate performance and enforcement of the contract when it is consistent with and in furtherance of the agreed-upon terms of the contract, or where it effectuates the parties' objectively reasonable expectations under the contract." Morrow v. Red Shield Ins. Co., 212 Or. App. 653, 661-62, 159 P.3d 384, 388-89 (2007); see also Uptown Heights Assoc. Ltd. P'ship v. Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639, 643 (1995) (explaining that "every contract contains an implied duty of good faith" which "is to be applied in a manner that will effectuate

the reasonable contractual expectations of the parties") (internal quotation marks omitted).

Under the implied duty, courts from a variety of jurisdictions, including Oregon, have implied a "reasonable" time period when a contract fails to specify one. E.g., Denson v. Stack, 997 F.2d 1356, 1361 (11th Cir. 1993) (under Florida law, when a contract does not expressly fix the time for performance of its terms, the law will imply a reasonable time); MLM Prop, LLC v. Country Cas. Ins. Co., No. CV 06-3048-CL, 2010 WL 678149, at *8 (D. Or. Feb. 25, 2010) (under Oregon law, if an insurance contract does not set forth a time period for replacement of assets, the law will imply a requirement that it be done within a reasonable time); Pyle v. Wolf Corp., 354 F. Supp. 346, 357 (D. Or. 1972) (noting that it is "reasonably settled when parties agree on the payment of money but do not specify the period of time within which it is to be paid, the law will imply that it is within a reasonable time"); Spaulding v. McCaige, 47 Or. App. 129, 135, 614 P.2d 594, 598 (1980) (noting the doctrine that when no time for performance of a contract is specified in the contract, courts will imply a reasonable time term).

Because a reasonable time for the contractor to issue a written decision is properly implied into subsection (d), plaintiff's argument about a lack of an express time is without merit.

Next, plaintiff argues that the thirty-day time period in which to demand arbitration is onerous. I disagree. The language specifically requires that the thirty-day clock commence with the subcontractor's receipt of the written decision. Thirty days after plaintiff receives notice is not an unreasonable amount of time.

Plaintiff also complains about subsection (d)'s provision regarding consolidation. The language provides that if arbitration is conducted involving the owner, the contractor, or any other party, concerning the subcontract, the work, or the subcontractor, then the contractor may

call for consolidation of such claims.  The subcontractor expressly agrees to such consolidation

or joinder.  And, without consolidation called for by the contractor, no request for joinder or

consolidation may be determined except by a court of competent jurisdiction.  Plaintiff argues

that the provision deprives it of the opportunity to compel joinder of its claims and forces

plaintiff to be bring multiple lawsuits and arbitrations over the same issues, involving the same

facts and parties, and possibly resulting in different outcomes.

     I read the language as giving the contractor the right to consolidate separate pending

arbitrations brought by other subcontractors or parties which relate to this subcontract, this work,

or this subcontractor.  Even if plaintiff is correct that the contractor retains sole discretion for

consolidating or joining multiple claims brought by plaintiff, it is not unconscionable because it

does not effectively deprive plaintiff of the ability to bring a claim.

     Plaintiff next attacks the lack of a "fee shifting" provision in subsection (d).  Under that

subsection, the responsibility for each party to bear its own attorney's fees and an equal portion of

the arbitrator costs applies "regardless of any other legal action related to the matter being

arbitrated."

     Arbitration clauses that fail to contain a fee-shifting provision to preserve fees

recoverable by law can impose a significant burden on a party seeking to arbitrate a claim that

ordinarily provides for fees.  See Graham Oil Co. v. Arco Prods. Co., 43 F.3d 1244, 1247 (9th

Cir. 1994) (court declined to enforce an arbitration agreement under the Petroleum Marketing

Practices Act because it deprived the prevailing party the right to obtain attorney's fees, an

important statutorily-mandated right; arbitration agreement cannot "purport[ ] to forfeit certain

important statutorily-mandated rights or benefits"); Chalk v. T-Mobile USA, Inc., No. 03:06-cv-

158-BR, 2006 WL 2599506, at *6-7 (D. Or. Sept. 7, 2006) (arbitration provision prevented

plaintiff from obtaining fees plaintiff would otherwise be entitled to as the prevailing party in an

unfair trade practices claim ), rev'd on other grounds, 560 F.3d 1087 (9th Cir. 2009).

Here, the only claim with a right to attorney's fees is the lien foreclosure claim against

Intel.  Or. Rev. Stat. § 87.060(5) (providing for attorney's fees to prevailing party in a suit to

enforce a lien perfected under O.R.S. 87.035).  Although defendants do not seek to arbitrate that

claim, plaintiff contends, as I understand it, that the substance of the dispute forming the basis of

that claim will be fought with HCC in the arbitration and the fees plaintiff pays in that forum are

not recoverable, negating the value of the fee-shifting statute for the lien claim.  See Pl.'s Mem. at

29 (noting that the provision prevents "the recovery of fees against Intel on the mechanics lien

foreclosure which *are incurred in the arbitration with HCC*"); see also Harris v. Dyer, 292 Or.

233, 236, 637 P.2d 918, 919 (1981) (noting the plaintiff's argument that "the larger part of

attorney fees in foreclosing a disputed construction lien arises not in filing the lien claims and the

complaint but in litigating the amount of the claim, and that such fees should be recovered even

if this phase of the dispute occurs before arbitrators rather than in court.").  Additionally, plaintiff

argues that because Intel is not bound by rulings made in an arbitration with HCC, the effect of

the provision is to double the fees plaintiff will incur to litigate the lien foreclosure claim, while

allowing recovery for only half of them.

I disagree with plaintiff.  First, if plaintiff must litigate issues related to the lien

foreclosure claim against Intel in a court proceeding which it previously raised in the arbitration

with HCC, nothing in subsection (d) precludes plaintiff from recovering attorney's fees for the

time spent in the court proceeding on the lien foreclosure claim.  Second, to the extent issues in

the arbitration with HCC are determinative in establishing plaintiff's underlying right to payment

from Intel, there is nothing unconscionable about requiring the parties to bear their own fees in

the arbitration, even if plaintiff could have obtained fees for such time if the issue had been

litigated in court.  As the <u>Harris</u> court explained:

> it may be said that arbitration is not imposed by law as a phase of litigation, but is chosen by the parties precisely as an alternative to litigation, on terms set by the parties themselves. Indeed, if the dispute had been arbitrated according to the contract without reaching any occasion to invoke the lien law, the costs of arbitration would be governed by the contract, and plaintiff could not invoke ORS 87.060(4), <u>supra</u>, to recover attorney fees. We doubt that when that section speaks of attorney fees to the "prevailing party" as a part of "costs" in a lien foreclosure proceeding, it means to include more than the statutory procedures themselves, or that it means to invite foreclosure suits as a step toward obtaining attorney fees for an arbitration under a contract that does not provide for such fees.

<u>Id.</u> at 236-37, 637 P.2d at 919-20.

Plaintiff's final argument directed at subsection (d) is that it lacks mutuality.  <u>Motsinger</u>

disposes of that argument by making clear that the inclusion of a unilateral arbitration clause

does not, by itself, render an arbitration agreement unconscionable.

3.  Subsections (e) - (g)

Plaintiff takes issue with several provisions in these subsections, including subsection

(e)'s requirement that plaintiff keep working during the pendency of a claim, subsection (f)'s

requirement that the dispute resolution provisions survive the completion or termination of the

subcontract, and subsection (g)'s provision that plaintiff's sole recourse if the subcontract is not

completed as contemplated or if a dispute arises over the rights of the subcontractor, is an "action

as provided herein[.]"[5]  I find none of the provisions unconscionable because they do not

---

[5] Because the word "action" is modified by "as provided herein," I reject plaintiff's argument that the word "action" means a legal action in court.

effectively deprive plaintiff of the opportunity to pursue redress of its claims before a neutral

decisionmaker.

D.  Totality of Circumstances

Even when I consider the dispute resolution provisions in Section XVII together rather

than separately, they do not effectively deny plaintiff its right to bring claims "in the arbitral

forum."  Vasquez-Lopez, 210 Or. App. at 573, 152 P.3d at 951.  Given the reluctance of courts to

find dispute resolution procedures unconscionable, and given that the parties here do not have the

degree of unequal bargaining power seen in other contexts, overall and considered together,

plaintiff fails to establish that the dispute resolution provisions prevent it from pursuing its

claims in a neutral forum.

III.  Public Policy

Plaintiff makes a separate argument that the contract is void as against public policy.

Plaintiff argues that because Oregon promotes arbitration by noting its benefits of cost-

effectiveness and speedy resolution, any arbitration that is not cost-effective and does not provide

a speedy resolution is void as against public policy.

Defendants note that plaintiff fails to cite to any Oregon authority recognizing these

attributes of arbitration agreements and that the Supreme Court has recognized the purpose of the

Federal Arbitration Act as ensuring "judicial enforcement of privately made agreements to

arbitrate."  Dean Witter Reynolds, 470 U.S. at 219-21 (noting that the court must "rigorously

enforce agreements to arbitrate, . . . absent a countervailing policy manifested in another federal

statute"); see also Bettencourt v. Brookdale Senior Living Cmtys., Inc., No. 03:09-cv-01200-BR,

2010 WL 274331, at *8 (D. Or. Jan. 14, 2010) (noting that the"Oregon Supreme Court has long

32 - OPINION & ORDER

recognized the important public policy favoring freedom of contract").

Even if I accept plaintiff's statement of the public policy behind the promotion of arbitration agreements, I reject plaintiff's argument because plaintiff fails to show that arbitrating its disputes with HCC is not cost effective and will not provide a speedy resolution of its claims.

IV.  Remaining Claims

Because I agree with defendants, I grant the motion to dismiss.  However, I agree with plaintiff that its intentional interference with business relations claim against HCC should not be dismissed with the other non-lien foreclosure claims because it does not arise from the subcontract and is outside the scope of the arbitration provision.  Nonetheless, that claim is properly stayed along with the lien foreclosure claim which defendants did not seek to dismiss.

The basis of the intentional interference claim is that HCC represented to third parties that plaintiff was in financial trouble without also representing that HCC's failure to pay plaintiff caused those financial difficulties.  Whether HCC was justified in failing to pay plaintiff what plaintiff believes it is owed will be determined in the arbitration.  If HCC was justified in failing to pay, plaintiff will be unable to show that HCC made intentional misrepresentations or omissions.  As a result, this claim hinges on determinations to be made in the arbitration and is stayed along with the lien foreclosure claim.

/ / /

/ / /

/ / /

/ / /

/ / /

33 - OPINION & ORDER

CONCLUSION

Defendants' motion to dismiss [27] is granted and all claims except the lien foreclosure

claim against Intel and the intentional interference with business relations claim against HCC, are

dismissed.  Those two claims are stayed pending arbitration.

IT IS SO ORDERED.

Dated this _____ day of _____, 2013



Marco A. Hernandez
United States District Judge